## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

NORTHERN NEW MEXICANS PROTECTING
LAND WATER AND RIGHTS,

      Plaintiff,

vs.                                                                                    No. CIV 15-0559 JB/LF

UNITED STATES OF AMERICA, and SALLY
JEWELL, Secretary, U.S. Department of Interior,
KEVIN WASHBURN, Assistant Secretary, Bureau
of Indian Affairs, WILLIAM WALKER, Regional
Director, Bureau of Indian Affairs, Southwest
Office, RAYMOND FRY, Superintendent,
Northern Pueblo Agency,

      Defendants.

### MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Federal Defendants' Motion to Dismiss and/or For Judgment on the Pleadings; Memorandum in Support, filed November 10, 2015 (Doc. 22)("MTD"). The Court held a hearing on January 28, 2016. The primary issues are: (i) whether Plaintiff Northern New Mexicans Protecting Land Water and Rights has associational standing to sue on behalf of members who have not sought just compensation for their loss; (ii) whether Defendant United States of America has consented to be sued, thereby giving the Court jurisdiction to hear the case; and (iii) whether Northern New Mexicans' remaining claims are barred, because the Quiet Title Act, 28 U.S.C. §§ 1346(f), 2409a, is the exclusive means for resolving title disputes. Regarding the first issue, the Court determines that the Court lacks jurisdiction to hear Northern New Mexicans' claims under the Takings Clause of the Fifth Amendment to the Constitution of the United States of America and the Quiet Title Act. Second, because the United States does not consent to be sued under the Quiet Title Act, the Court lacks

jurisdiction over Northern New Mexicans' quiet title claim.  Third, because the Quiet Title Act provides the exclusive means for adverse claimants to challenge the United States' title to real property, Northern New Mexicans' remaining claims are barred.

## FACTUAL BACKGROUND

Northern New Mexicans is a "nonprofit corporation whose members are property owners in New Mexico that are served by the rights of way know[n] as County Roads 84, 84A, 84B, 84C, 84D, and Sandy Way."   Complaint for Judicial Review Under the Administrative Procedures Act, 5 U.S.C. § 706; for Declaratory and Injunctive Relief Pursuant to 28 U.S.C. § 2201; and for a Violation of Equal Protection Under the Law ¶ 1, at 2, filed June 30, 2015 (Doc. 1)("Complaint").  The properties that Northern New Mexicans' members own "are served and accessed by long-standing and vested rights-of-way easements."  Complaint ¶ 13, at 4.  These easements -- County Roads 84, 84A, 84B, 84C, 84D, and Sandy Way -- have "been regarded as public rights-of-way owned by the State of [New] Mexico and administered as either a State highway or as a County Road."  Complaint ¶ 17, at 4.  Northern New Mexicans asserts that its members or the County have long-standing easements, or at least rights to use these roads, that were established decades ago.  See Response at 11.

1.      **The History of Revised Statute 2477.**

In 1866, Congress provided for public access across unreserved public lands by granting rights-of-way for highway construction.  See Act of July 26, 1866, § 8, ch. 262, 14 Stat. 251, 253, codified at 43 U.S.C. § 932 ("[T]he right of way for the construction of highways over public lands, not reserved for public uses, is hereby granted."), repealed by Federal Land Policy and Management Act of 1976, Pub. L. No. 94-579 § 706(a), 90 Stat. 2743, 2793 ("FLPMA").  The 1866 Act came to be known as "R.S. 2477."  Letter from Anthony H. Gamboa, General

Counsel, Gov't Accountability Office, to Jeff Bingaman, United States Senator, Regarding Recognition of R.S. 2477 Rights-of-Way under the Department of the Interior's FLPMA Disclaimer Rules and Its Memorandum of Understanding with the State of Utah (Feb. 6, 2004), filed December 22, 2015 (Doc. 30-5)("GAO Letter").  R.S. 2477 was self-executing, meaning that an R.S. 2477 right-of-way could come into existence, without any formal public action, whenever the public sufficiently indicated its intent to accept the grant by establishing a public highway across public lands.  See S. Utah Wilderness Alliance v. Bureau of Land Mgmt., 425 F.3d 735, 770 (10th Cir. 2005); GAO Letter at 1-2.

On October 21, 1976, Congress enacted the FLPMA, which repealed R.S. 2477, but it preserved "any valid" right-of-way "existing on the date of approval of this Act."  Pub. L. No. 94-579, §§ 701(a), 706(a), 90 Stat. 2743, 2786, 2793 (1976).  See S. Utah Wilderness Alliance v. Bureau of Land Mgmt., 425 F.3d at 741 ("In 1976 . . . Congress abandoned its prior approach to public lands and instituted a preference for retention of the lands in federal ownership, with an increased emphasis on conservation and preservation.").  Consequently, R.S. 2477 rights-of-way perfected before Congress repealed the statute in 1976 remain valid today, assuming they have not lapsed.  See GAO Letter at 1-2.  After Congress repealed the statute, the public often did not know with certainty whether the rights-of-way were valid, because R.S. 2477 "did not require government approval or public recording of title."  GAO Letter at 2.  To handle this uncertainty, the United States Department of the Interior issued a series of policy and other documents discussing how it would administratively recognize or validate specific rights-of-way.  See GAO Letter at 2.  By 1993, the Interior Department and the court together "had recognized about 1,453 R.S. 2477 rights-of-way across Bureau of Land Management (BLM) lands, with about 5,600 claims remaining."  GAO Letter at 2-3.

- 3 -

In 1994, the Interior Department issued a proposed rule to establish a formal process to evaluate R.S. 2477 claims.  See GAO Letter at 3.  Congress responded by enacting temporary moratoria and, in 1996, imposed a permanent prohibition on certain R.S. 2477-related activity.  See GAO Letter at 3.  The permanent prohibition states: "No final rule or regulation of any agency of the Federal Government pertaining to the recognition, management, or validity of a right-of-way pursuant to [R.S. 2477] shall take effect unless expressly authorized by an Act of Congress subsequent to the date of enactment of this Act."  GAO Letter at 3.  Congress' enactment meant that numerous R.S. 2477 claims remained unresolved.  See GAO Letter at 3-4.  To help resolve some of the lingering uncertainty, the Interior Department amended its existing regulations to implement FLPMA § 315, 43 U.S.C. § 1745(a).  See GAO Letter at 3.  FLPMA § 315 authorizes the Interior Department to issue recordable disclaimers of United States interests in lands.  See FLPMA § 315(a), 43 U.S.C. § 1745(a).  The Interior Department used this process to validate R.S. 2477 rights-of-way.  See GAO Letter at 3-4.

State or local governments may file suits to quiet title against the United States if they can demonstrate that they accepted the right-of-way grant before Congress repealed the statute in 1976.  Because the Quiet Title Act represents the exclusive means by which claimants may challenge the United States' title to real property, however, R.S. 2477 claims are barred if the claimant cannot satisfy the Quiet Title Act's conditions for waiving sovereign immunity.  See Sw. Four Wheel Drive, 363 F.3d at 1071 (holding that the plaintiff "cannot establish a claim under the Quiet Title Act [to a public right-of-way under R.S. 2477 across federal public lands] and thus it cannot bring suit against the United States").

2.      **The History of the Disputed Roads**.

Northern New Mexicans asserts that its members or the County gained title to these roads

decades ago.  See Response at 11.  Historians provide insight into the roads' ownership:

> So far as known, no deed or other documentary evidence of title has been
> obtained from the Indians, but it appears from evidence submitted that this road or
> highway has been used by the public for more than fifty years, and the Board has
> determined and hereby (p. 538)/ determines that the Territory and State acquired
> by such use, an easement in and over said land, subject only to a reversion to the
> Pueblo whenever said land shall no longer by [sic] used by the public or the state
> as a highway, or shall be abandoned by the State for a new location across said
> Grant.

Stanley M. Hordes, History of the Santa Fe County Roads Passing Through Boundaries of

Tesuque, Pojoaque, Nambe, San Ildefonso and Santa Clara Pueblos ("Hordes Report), available

at http://nnmprotect.org/docs/CR84/HordesReportSantaFeCountyFull.pdf.

Federal officials have similarly recognized the historic existence of Spanish land grant

access roads.  Ralph Emerson Twitchell, Special Assistant to the United States Attorney General,

noted

> I have deemed it advisable to call your attention to the fact that the lands of every
> Indian Pueblo in New Mexico are crossed by highways which have existed since
> the earliest days of the Spaniards and which are not in the most part State
> highways and part of the highway system in this section.  There is not doubt in
> my mind that these roads, having been established by the Spaniards, the public
> has acquired a right by prescription to the use of the same and that no interference
> will meet with the approval of the Court . . . .

Letter from R.E. Twitchell, Special Assistant to the Attorney General, to Charles H. Burke,

Commissioner of Indian Affairs, Santa Fe (March 22, 1923), filed December 22, 2015 (Doc. 30-

1).  Similarly, the Solicitor for the Interior found in 1959 that

> it has traditionally been customary for mining locators, homestead, and other
> public land entrymen to build and or use such roads across public lands other than
> granted rights-of-way as were necessary to provide ingress and egress to and from
> their entries or claims without charge, the question whether a fee may be charged

> for such use is not only of broad, general interest but to make such a charge now
> would change a long practice.

United States Department of the Interior, 66 Decisions of the Department of the Interior 361 (1959). Accordingly, Northern New Mexicans argues that the San Ildefonso Pueblo does not own these roads. See Response at 10.

In contrast, the San Ildefonso Pueblo has argued for decades that it owns these roads. See San Ildefonso Orders County Off Land: SF Has No Right-of-Way Over Pueblo Lands for Road Maintenance, The New Mexican, Aug. 4, 1965, at A1 (explaining that the San Ildefonso Pueblo ordered Santa Fe County to stop maintaining roads on "pueblo property"). After ordering Santa Fe County not to use the roads in 1965, the disputes continued. See Dale Lezon, San Ildefonso, County To Discuss Easements: Officials Seek More Ongoing Exchange, Albuquerque Journal, Aug. 12, 1999, at B2 ("Lezon Article"). In 1999, Santa Fe County officials met with Pueblo officials to attempt to resolve "[u]ncertainty over easements for county roads on tribal land." Lezon Article at 1. Richard Anaya, County Commissioner in 1999, said that "[p]aying the pueblo for county road easements may be necessary." Lezon Article at 1. Nonetheless, Marcos Trujillo, another 1999 County Commissioner, stated that he refused to support paying for easements. See Lezon Article at 1. Northern New Mexicans notes that Santa Fe County and the Pueblo were not able to resolve the disputes over the rights-of-way.

### 3.     The Events Leading to the Lawsuit.

On December 6, 2013, the Bureau of Indian Affairs ("BIA") sent a letter to some of Northern New Mexicans' members informing them that they were trespassing "on tribal lands of the Pueblo of San Ildefonso." Letter from Raymond Fry, Superintendent of the Bureau of Indian Affairs' Northern Pueblo Agency, to Katherine Miller (dated December 6, 2013), filed June 30, 2015 (Doc. 1-2)("December 6 Letter"). Northern New Mexicans asserts that, through this

December 6 Letter, the BIA "has acted arbitrarily and capriciously" by "seeking to extinguish these public property rights/easements that cross tribal land, and which provide the sole means of access to Plaintiff's fee simple real property." Complaint ¶ 19, at 4. Northern New Mexicans argues that the BIA's action has impaired its members' ability to use the public easements to access their property. See Complaint ¶ 20, at 5. Accordingly, Northern New Mexicans asserts four causes of action against the four Defendants: (i) the United States; (ii) Sally Jewell, Secretary of the United States Department of Interior; (iii) Kevin Washburn, Assistant Secretary for the BIA; (iv) William Walker, Regional Director for the BIA's Southwest Office; and (iv) Raymond Fry, Superintendent for the Northern Pueblo Agency within the BIA Southwest Region.

First, Northern New Mexicans alleges that the Defendants acted arbitrarily and capriciously by issuing a decision in derogation of its members' public right-of-way easement. See Complaint ¶ 26, at 5. It argues that the Defendants issued a memorandum stating that Northern New Mexicans' members were trespassing by using their rights-of-way. See Complaint ¶ 32, at 6. Northern New Mexicans contends that the Defendants' memorandum, and "ongoing refusal to recognize and grant Plaintiff's members access to its private property by way of Plaintiff's vested easement violates the Act of 1866, and Plaintiff's members vested property rights." Complaint ¶ 32, at 6. Northern New Mexicans argues that the Defendants' actions are arbitrary, capricious, and an abuse of discretion under the Administrative Procedure Act, 5 U.S.C. §§ 701-706 ("APA"). Complaint ¶ 33, at 6.

Second, Northern New Mexicans brings a quiet title action under the Quiet Title Act. It contends that its members have "a vested right of ingress and egress to their private property over the rights-of-way for which the County of Santa Fe holds title." Complaint ¶ 39, at 7.

Northern New Mexicans argues that, because the Defendants' interference with its members' property rights has clouded title to their property, the Court should quiet title "by declaring the existence and validity of such rights-of-way."  Complaint ¶ 44, at 8.

Third, Northern New Mexicans alleges that, if the law allows the Defendants to deprive its members of the right of access to their real property and cloud title, "such action constitutes a taking of Plaintiff's property for which compensation is due within the meaning of the [Takings Clause of the] Fifth Amendment" to the Constitution of the United States.  Complaint ¶ 48, at 8. Finally, Northern New Mexicans argues that the Treaty of Guadalupe Hidalgo, art. 8, July 4, 1848, 9 Stat. 929, affords former Mexican citizens occupying the land on which Northern New Mexicans' members now reside "the full protection of United States citizens and equal protection under the laws of the United States."  Complaint ¶ 57, at 10.  It contends that the Defendants' actions in preventing its members from accessing their property violate its members' rights to equal protection under the law.  See Complaint ¶ 60, at 10.

Northern New Mexicans seeks a declaratory judgment stating: (i) that the Defendants' interference with its access rights is "arbitrary, capricious, an abuse of discretion and/or otherwise unlawful," Complaint ¶ 1, at 10-11; (ii) that the "public holds the previously described rights-of-way as a vested property right"; Complaint ¶ 2, at 11; (iii) that the Defendants' attempt to deny Northern New Mexicans' members access to their property violates the Due Process Clause of the Fifth Amendment, see Complaint ¶ 4, at 11; and (iv) that the Defendants' actions violate "the rights preserved to Plaintiff's members by the Treaty of Guadalupe Hidalgo," Complaint ¶ 5, at 11.  Northern New Mexicans also asks the Court to enjoin the Defendants from interfering with the public's vested rights.  See Complaint ¶ 3, at 11.

**PROCEDURAL BACKGROUND**

The Defendants answered the Complaint by including a Prefatory Statement indicating that the APA and the Federal Rules of Appellate Procedure -- not the Federal Rules of Civil Procedure -- apply to two of Northern New Mexicans' causes of action.  See Federal Defendants' Answer at 1-2, filed September 21, 2015 (Doc. 8)("Answer").  The Court concluded that the Defendants' Prefatory Statement constitutes a proper response to Northern New Mexicans' assertion of two APA claims.  See Northern New Mexicans Protecting Land Water and Rights v. United States, 2015 WL 8329509, at *1 (D.N.M. Dec. 4, 2015)(Browning, J.).

    **1.**    **The MTD.**

The Defendants raise numerous jurisdictional flaws about Northern New Mexicans' Complaint.  See MTD at 1-2.  First, they argue that the Quiet Title Act "provides the *exclusive* means by which Plaintiff can challenge BIA's December 6, 2013 letter, and thus Plaintiff's APA, constitutional, and Treaty claims are barred by the QTA's limits on the United States' waiver of sovereign immunity."  MTD at 1 (emphasis in original).  In turn, they assert that the "quiet title claim is barred because the QTA's waiver of sovereign immunity is limited to title claims that do not involve 'trust or restricted Indian lands,'" which are the lands at issue.  MTD at 1-2.  The Defendants argue that these "two issues alone render this Court without jurisdiction to hear any of the claims in Plaintiff's Complaint."  MTD at 2.

The Defendants next contend that, even beyond the "dispositive jurisdictional issues, the Court would lack jurisdiction based on other considerations."  MTD at 2.  First, the Defendants assert, Northern New Mexicans are not proper plaintiffs in a quiet title action, because they "failed to invoke the QTA's waiver of sovereign immunity by failing to plead with 'particularity' its interests" in the disputed properties.  MTD at 2 (quoting 28 U.S.C. § 2409a(d)).  Second, the

Defendants argue that Northern New Mexicans cannot pursue their takings claim, because the Tucker Act, 28 U.S.C. § 1491, "vests jurisdiction for such claims solely in the U.S. Court of Federal Claims."  MTD at 2.

Third, the Defendants contend that "Plaintiff lacks associational standing because quieting title in the alleged rights-of-way or easements and seeking just compensation for the alleged taking of its members' properties requires the individual members to participate in the lawsuit."  MTD at 2.  Fourth, the Defendants assert that "the Treaty of Guadalupe Hidalgo does not provide Plaintiff or its members with a cause of action."  MTD at 2.  Finally, the Defendants argue that "Plaintiff has failed to allege a plausible equal protection claim."  MTD at 2.  In total, the Defendants contend that the Court should dismiss Northern New Mexicans' APA and non-APA claims under rule 12(c) of the Federal Rules of Civil Procedure.  See MTD at 7.  The Defendants assert that the Court should apply the rule 12(b)(1) and 12(b)(6) standards in determining whether to dismiss Northern New Mexicans' claims under rule 12(c).  See MTD at 7.

### 2.    The Response.

Northern New Mexicans responded on December 22, 2015.  See Plaintiff's Response to Federal Defendants' Motion to Dismiss and/or for Judgment on the Pleadings, filed December 22, 2015 (Doc. 30)("Response").   It disputes the Defendants' theory "on many fronts." Response at 2.   Above all, Northern New Mexicans argues that, if it fails to plead with particularity, the fault lies with the Defendants for two reasons: (i) "it is the United States who created an 'alleged' title dispute"; and (ii) "the United States failed to identify the property that it claims an interest in, only identifying such interest in relation to the named county road rights-of-way."  Response at 2.  It asserts that it is "in a catch-twenty two," because the December 6 Letter

similarly does not identify the land with particularity.  Response at 2.  Northern New Mexicans appears to contend that, because the United States claims title to the land, it must identify the land with particularity.  See Response at 3.

Northern New Mexicans next responds to the Defendants' argument that the law bars their claims.  See Response at 4.  It asserts that the Quiet Title Act waives the United States' immunity from suit.  See Response at 6.  Moreover, it states that, when a plaintiff does not assert any competing interest in the property at issue, the Quiet Title Act's waiver limitations and other requirements do not apply.  See Response at 7.  It argues that these limitations and requirements do not apply here, because Northern New Mexicans does not assert ownership of the property -- only its members assert interests.  See Response at 7.  Additionally, Northern New Mexicans contends that the law does not bar its other claims, because its action to quiet title is "not inextricably intertwined" with its other causes of action.  Response at 4.  It seems to suggest that the Quiet Title Act does not provide the exclusive remedy for title actions against the United States.  See Response at 8.  Accordingly, it argues that it can sue under the APA.  See Response at 13-14.

Northern New Mexicans also argues that it seeks to protect several vested easements, not ones that the County holds, but those that its members hold.  See Response at 14-15.  It asserts that many people may hold easements, which "are real property rights coexisting on the same right-of-ways which also exist overlain the top of the subservient fee property of the United States."  Response at 15.  Northern New Mexicans emphasizes that it does not allege the "rights vested in the state of New Mexico and the County of Santa Fe," but it asserts its members' right to use the public easements.  Response at 15-16.  It states: "These vested easements exist in

addition to the public easements vested in the state of New Mexico and Santa Fe County."
Response at 16.

It concedes that the "United States government has long argued against the notion that private vested easements across public ground for rights-of-way exist," but argues that "good grounds and precedent exist to support just that outcome."  Response at 16.  Despite its argument that precedent supports the existence of private easements in this situation, it "will admit to the Court that the only case secured deciding private vested easements existing across federal lands is *United States v. 9,947.71 Acres of Land, More or Less, in Clark Cty., State of Nev.*, 220 F. Supp. 328, (D. Nev. 1963)["(9,947.71 Acres of Land)"]."  Response at 16.  Northern New Mexicans asserts that its situation is similar to the situation in 9,947.71 Acres of Land, because the United States passed title to its right-of-way to the public in the Treaty of Guadalupe Hidalgo.  See Response at 19.

Regarding the Tucker Act claim, Northern New Mexicans argues that the Court has jurisdiction over its Tucker Act claim, because it does not seek damages over $10,000.00.  See Response at 19.  It contends that, because it seeks only a declaratory judgment, it "may permissibly pursue this action under the federal district courts' concurrent jurisdiction.  See Response at 20.  Finally, it asserts that it has associational standing.  See Response at 21.

**3.    The Reply.**

The Defendants replied on January 22, 2016.  See Federal Defendants' Reply in Support of Motion to Dismiss and/or for Judgment on the Pleadings, filed January 22, 2016 (Doc. 31)("Reply").[1]  The Defendants reiterate that "all of the claims raised in Plaintiff's Complaint are

---

[1]Pursuant to rule 25(d) of the Federal Rules of Civil Procedure, the Defendants substitute Lawrence S. Roberts, Acting Assistant Secretary of Indian Affairs, in Kevin Washburn's place.

premised on the title dispute over Plaintiff's and its members' alleged interests in rights-of-way over roads traversing the Pueblo of San Ildefonso."  Reply at 1.  As such, the Defendants argue that Northern New Mexicans' "lawsuit is cognizable -- if at all -- pursuant only to the waiver of sovereign immunity of the Quiet Title Act."  Reply at 1.  They emphasize that Northern New Mexicans' quiet title claims fail "on several grounds."  Reply at 1.

Most importantly, the Defendants argue, Northern New Mexicans cannot seek to quiet title to the disputed roads.  See Reply at 1-2.  They argue that, in recognition of this fact, the Response "changes course and contends that Plaintiff does not, after all, seek to quiet title in these roads."  Reply at 2.  They argue that, instead, Northern New Mexicans asserts that its members are adverse claimants who seek to quiet title.  See Reply at 3.  The Defendants assert that Northern New Mexicans "cannot amend its complaint with a response brief to a motion to dismiss."  Reply at 2.  Furthermore, the Defendants argue that "the QTA's 'prohibition of suits challenging the United States' title in Indian trust land may prevent suit even when a plaintiff does not characterize its action as a quiet title action.'"  Reply at 2 (quoting Iowa Tribe of Kan. & Neb. v. Salazar, 607 F.3d 1225, 1230 (10th Cir. 2010)).  They also argue that Northern New Mexicans cannot avoid the Quiet Title Act's limitations by alleging that the disputed roads are public roads.  See Reply at 5.

The Defendants raise standing concerns in connection with Northern New Mexicans' quiet title claim.  See Reply at 3.  They argue that associations can bring only derivative claims -- "the claims of its members who would have standing in their own right" -- unless it asserts a direct harm to itself.  Reply at 3.  Here, they contend, Northern New Mexicans "readily agrees that its members are adverse claimants" to provide the organization with standing, yet

See Reply at 1 n.1; Fed. R. Civ. P. 25(d)(stating that, when a public officer "ceases to hold office while the action is pending . . . [t]he officer's successor is automatically substituted as a party").

simultaneously argues that Northern New Mexicans as an entity is not an adverse claimant under the Quiet Title Act, thereby allowing it to maintain its suit.  Reply at 3.  The Defendants argue that the "Plaintiff cannot have it both ways."  Reply at 3.  Moreover, the Defendants contend that litigating the quiet-title claim requires "direct participation of Plaintiff's members as parties."  Reply at 11.  The Defendants allege, however, that direct participation precludes associational standing.  See Reply at 11.

The remainder of the Defendants' Reply reasserts the MTD's arguments that the Quiet Title Act provides the only means by which Northern New Mexicans can sue.  See Reply at 4-5 (arguing that Northern New Mexicans cannot pursue its APA claim); id. at 6-7 (stating that Northern New Mexicans' quiet-title claim does not satisfy the Quiet Title Act's sovereign immunity waiver); id. at 11-12 (contending that the Quiet Title Act bars Northern New Mexicans' claim because it fails to plead with particularity); id. at 12 (arguing that Northern New Mexicans does not allege the necessary facts to plead an equal-protection claim).  The Reply concludes by arguing that the Court lacks jurisdiction over Northern New Mexicans' takings claim, because Northern New Mexicans seeks only a declaratory judgment, while "just compensation . . . is the only proper remedy for a takings claim."  Reply at 10.  The Defendants state: "Because Plaintiff's Complaint fails to plead any jurisdictional amount of damages for its takings claim, it has failed to establish this Court's jurisdiction and the claim must be dismissed."  Reply at 11.

4.      **The Hearing**.

The Court held a hearing on January 28, 2015.  See Transcript of Hearing (taken January 28, 2015)("Tr.").[2]   The Court initiated the hearing by explaining its position on the parties' claims.  See Tr. at 2:1-11:24 (Court).  The United States agreed with the Court's position that Northern New Mexicans lacks standing on the quiet-title and takings claims.  See Tr. at 12:7-11 (agreeing with the Court's analysis).  The Court then asked the United States whether Northern New Mexicans has standing to pursue its APA claim.  See Tr. at 12:16-20 (Court).  The United States asserted that it did not consider the December 6 Letter a final agency action under the APA, which it said is a prerequisite to the Court's jurisdiction.  See Tr. at 13:3-10 (Smith).  It stated that the letter was a statement of a legal position and not a final determination to undertake a project.  See Tr. at 13:3-10 (Smith).  It argued that it was a request for negotiations and that, before the BIA took any further action, it would have to refer the matter up the hierarchy to seek a legal decision whether a trespass is actually occurring.  See Tr. at 13:17-22 (Smith).  In short, it asserted that the December 6 Letter was only a "step in the process."  Tr. at 15:3 (Smith).  Accordingly, it argued that Northern New Mexicans lacked standing on the quiet-title claim, the takings claim, and the APA claim.  See Tr. at 20:20-23 (Smith).

Northern New Mexicans responded that it has standing on all of its claims, because it seeks a declaratory judgment.  See 21:23-22:3 (Richards).  The Court asked how Northern New Mexicans could litigate its takings claim and quiet-title claim without involving its members, which would preclude standing.  See Tr. at 22:9-13 (Court).  Northern New Mexicans could not provide a case holding that it did not need its members to litigate the claim, but it argued that it could do so, because it sought only a declaratory judgment.  See Tr. at 23:9-12 (Richards); id. at

---

[2]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

24:2-5 (Richards)(stating that, for declaratory judgment actions, "we don't believe the individual members have to be brought in at this time").  It cited cases indicating that courts can issue declaratory relief for takings claims.  See Tr. at 23:12-20 (Richards).  It observed in passing, however, that the cases provided such relief only when compensation was unavailable.  See Tr. at 24:23-25:1 (Richards)(citing a case that granted injunctive relief "where a claims court remedy is inadequate").

At one point, Northern New Mexicans admitted that plaintiffs cannot make a takings claim until they are denied compensation.  See Tr. at 32:12-21 (Richards)("If you don't get compensation, then you can bring a takings claim but until you are denied, sometimes in state court, sometimes in Federal Court, you just don't get to make a takings claim.").  Nevertheless, it argued that it or its members could pursue compensation claims, demonstrating to the Court that adequate relief is available.  See Tr. at 26:8-9 (stating that compensation will be available if they can show there has been a taking); id. at 26:13-15 (Richards)(asserting that each member could bring an individual claim for compensation); id. at 33:10-17 (Richards)("If this Court were to provide that type of declaration then the individuals who are harmed in the future by the actual taking could go forward and bring a compensatory damages claim.").  Northern New Mexicans admitted that it has never sought compensation in this case or any other case.  See Tr. at 37:11-13 (Richards).  Later in the hearing, Northern New Mexicans conceded that no taking had occurred: "The letter itself doesn't take the property. The letter itself impacts a right that will at some point in the future cause a taking of certain property rights."  Tr. at 25:10-13 (Richards).  It therefore admitted that, currently, it has no takings claim.  See Tr. at 32:9-12 (Richards)("We are not yet arguing there has been an absolute taking.  We're arguing that the actions the Government is currently engaging in may result in a taking.").

Northern New Mexicans then stated that it wanted to amend its pleadings to remove its takings claim.  See Tr. at 26:4-6 ("We do not want to bring a direct takings claim at this point.").  It also stated that it agrees with the Court that it should dismiss its quiet-title claim.  See Tr. at 27:7-10 (Richards).  It asserted that it has sought to amend its Complaint previously, even suggesting that the Court had not permitted it to amend, see Tr. at 27:7-11, but Northern New Mexicans never filed a motion to amend.  The Court asked what the amended claims would look like.  See Tr. at 27:20-23 (Court).  Northern New Mexicans asserted that it would seek a declaration that its membership has a right to use long-existing rights-of-ways, and that it would not seek to quiet title in its member's or the County of Santa Fe's names.  See Tr. at 28:5-16 (Richards).  In short, it contended that the amended complaint could not bring a quiet title action, because it does not seek to quiet title in any party's name.  See Tr. at 29:9-12 (Richards).

The United States then argued that, even if Northern New Mexicans had standing, the Court would nonetheless lack jurisdiction, because the United States did not waive sovereign immunity.  See Tr. at 43:1-44:17 (Smith).  It stated that the United States does not waive its sovereign immunity when a person claims an interest in Indian lands.  See Tr. at 44:25-45:25 (Smith).  Further, the United States observed that the County of Santa Fe is not involved in the litigation.  See Tr. at 18:5-12 (Smith).  It suggested that Santa Fe County did not bring a lawsuit, because it "probably recognized that the quiet title act is not available here, and that other avenues have to be pursued."  Tr. at 18:6-8 (Smith).  The Court asked Northern New Mexicans why Santa Fe County was not involved.  See Tr. at 37:16-17 (Court).  Northern New Mexicans responded that Santa Fe County has its own legal counsel and chose not to be involved in this lawsuit.  See Tr. at 37:18-38:5 (Richards).

The United States then argued that the Court must dismiss Northern New Mexicans' remaining claims, because they all require the Court to determine title to the disputed roads.  See Tr. at 38:24-39:25 (Smith).  The United States contended that Supreme Court precedent bars the Court from issuing a declaratory judgment on any of Northern New Mexicans' remaining claims, because the declaration would require the Court to resolve the title dispute about who owns the roads.  See Tr. at 39:1-40:11 (Smith).  The Court asked Northern New Mexicans how the Court could grant relief on Northern New Mexicans' remaining claims without determining who owns title to the roads.  See Tr. at 55:16-19 (Court).  Northern New Mexicans said that the Court could issue a declaration that the United States deprived them of their fundamental right -- the right to own property.  See Tr. at 55:20-25 (Richards).

The United States asserted that, instead of pursuing this litigation in its current form, Northern New Mexicans' members should proceed under the Tucker Act in seeking compensation.  See Tr. at 60:11-19 (Smith).  It stressed, however, that the members did not need to act immediately, because no taking had occurred, and because there was no final agency action under the APA.  See Tr. at 60:11-61:16 (Smith).

## LAW REGARDING STANDING

A federal court may hear cases only where the plaintiff has standing to sue.  Standing has two components.  First, standing has a constitutional component arising from Article III's requirement that federal courts hear only genuine cases or controversies.  Second, standing has a prudential component.  See Habecker v. Town of Estes Park, Colo., 518 F.3d 1217, 1224 n.7 (10th Cir. 2008)(Lucero, J.)(noting that prudential standing concerns may prevent judicial resolution of a case even where constitutional standing exists).  The burden of establishing standing rests on the plaintiff.  See, e.g., Steel Co. v. Citizens for a Better Env't, 523 U.S. 83,

104 (1998).  The plaintiff must "allege . . . facts essential to show jurisdiction.  If they fail to make the necessary allegations, they have no standing."  FW/PBS v. City of Dallas, 493 U.S. 215, 231 (1990)(internal citations and quotations omitted).  Moreover, where the defendant challenges standing, a court must presume lack of jurisdiction "unless the contrary appears affirmatively from the record."  Renne v. Geary, 501 U.S. 312, 316 (1991)(quoting Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 546 (1986))(internal quotation marks omitted).  "It is a long-settled principle that standing cannot be inferred argumentatively from averments in the pleadings but rather must affirmatively appear in the record."  Phelps v. Hamilton, 122 F.3d 1309, 1326 (10th Cir. 1997)(Henry, J.)(quoting FW/PBS v. City of Dallas, 493 U.S. at 231)(citations omitted)(internal quotation marks omitted).

### 1.      Article III Standing.

"Article III of the Constitution limits the jurisdiction of federal courts to Cases and Controversies."  San Juan Cty., Utah v. United States, 503 F.3d 1163, 1171 (10th Cir. 2007)(en banc).  See U.S. Const. art. III, § 2.  "In general, this inquiry seeks to determine 'whether [the plaintiff has] such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination.'"  Wyoming ex rel. Crank v. United States, 539 F.3d 1236, 1241 (10th Cir. 2008)(Ebel, J.)(quoting Massachusetts v. EPA, 549 U.S. 497, 539 (2007))(internal quotation marks omitted).  "[A] suit does not present a Case or Controversy unless the plaintiff satisfies the requirements of Article III standing."  San Juan Cty., Utah v. United States, 503 F.3d at 1171.  To establish standing, a plaintiff must show three things: "(1) an injury in fact that is both concrete and particularized as well as actual or imminent; (2) a causal relationship between the injury and the challenged conduct; and (3) a likelihood that the injury would be redressed by a

favorable decision."   Protocols, LLC v. Leavitt, 549 F.3d 1294, 1298 (10th Cir. 2008)(Hartz, J.)(internal quotation marks omitted).

"Standing is determined as of the time the action is brought."   Smith v. U.S. Court of Appeals, for the Tenth Circuit, 484 F.3d 1281, 1285 (10th Cir. 2007)(Seymour, J.)(quoting Nova Health Sys. v. Gandy, 416 F.3d 1149, 1154 (10th Cir. 2005)(Ebel, J.)).  In Smith v. U.S. Court of Appeals, for the Tenth Circuit, the Tenth Circuit rejected a plaintiff's standing to challenge the Colorado appellate courts' practice of deciding cases in non-precedential, unpublished opinions, which the plaintiff asserted allowed courts to affirm incorrect decisions without interfering with official, "published" law.   484 F.3d at 1285.   The Tenth Circuit noted that the plaintiff had recently taken his state appeal and, therefore,

> was in no position to challenge the adequacy of state appellate review in cases culminating in unpublished opinions unless he could show that he would in fact receive such review from the state court of appeals (and from the state supreme court as well, if it took the case on certiorari).

484 F.3d at 1285.

By contrast, in Nova Health System v. Gandy, the Tenth Circuit found that abortion providers had standing to challenge an Oklahoma parental-notification law on the grounds that they were in imminent danger of losing patients because of the new law.   See 416 F.3d 1154. Although it concluded that the plaintiffs had standing, the Tenth Circuit was careful to frame the issue as whether, "as of June 2001 [the time the lawsuit was filed]," Nova Health faced any imminent likelihood that it would lose some minor patients seeking abortions.   416 F.3d at 1155. Moreover, while focusing on the time of filing, the Tenth Circuit allowed the use of evidence from later events -- prospective patients lost because of the notification law after the lawsuit began -- to demonstrate that the plaintiff faced an imminent threat as of the time of filing.   See 416 F.3d at 1155.

2.      __Prudential Standing__.

"Prudential standing is not jurisdictional in the same sense as Article III standing."

Finstuen v. Crutcher, 496 F.3d 1139, 1147 (10th Cir. 2007)(Ebel, J.).   Prudential standing

consists of "a judicially-created set of principles that, like constitutional standing, places limits

on the class of persons who may invoke the courts' decisional and remedial powers."  Bd. of Cty.

Comm'rs v. Geringer, 297 F.3d 1108, 1112 (10th Cir. 2002)(Ebel, J.)(internal quotation marks

omitted).  Generally, there are three prudential standing requirements: (i) "a plaintiff must assert

his own rights, rather than those belonging to third parties"; (ii) "the plaintiff's claim must not be

a generalized grievance shared in substantially equal measure by all or a large class of citizens";

and (iii) "a plaintiff's grievance must arguably fall within the zone of interests protected or

regulated by the statutory provision or constitutional guarantee invoked in the suit."  Bd. of Cty.

Comm'rs v. Geringer, 297 F.3d at 1112 (internal quotation marks and citations omitted).

Traditionally, federal courts framed the zone-of-interests test as an issue of prudential

standing.  The Supreme Court recently clarified that the zone-of-interests analysis "is an issue

that requires us to determine, using traditional tools of statutory interpretation, whether a

legislatively conferred cause of action encompasses a particular plaintiff's claim."  Lexmark Int'l

v. Static Control Components, 134 S. Ct. 1377, 1387 (2014).  Statutory standing "extends only to

plaintiffs whose interests fall within the zone of interests protected by the law invoked."

Lexmark Int'l v. Static Control Components, 134 S. Ct. at 1387.  Notably, the Supreme Court

stated that it "often 'conspicuously included the word 'arguably' in the test to indicate that the

benefit of any doubt goes to the plaintiff.'"  Lexmark Int'l v. Static Control Components, 134 S.

Ct. at 1389 (quoting Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak, 132

S. Ct. 2199 (2012)).  Moreover, the test "forecloses suit only when a plaintiff's interests are so

marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized the plaintiff to sue." Lexmark Int'l v. Static Control Components, 134 S. Ct. at 1389 (internal quotation marks and citations omitted). This "lenient approach" preserves the APA's flexible judicial-review provisions. Lexmark Int'l v. Static Control Components, 134 S. Ct. at 1389.

## LAW REGARDING SOVEREIGN IMMUNITY

"The United States cannot be sued without its consent." Garcia v. United States, 709 F. Supp. 2d 1133, 1137 (D.N.M. 2010)(Browning, J.). "Congressional consent -- a waiver of the traditional principle of sovereign immunity -- is a prerequisite for federal-court jurisdiction." Garcia v. United States, 709 F. Supp. 2d at 1137-38. "The plaintiff bears the burden of proving that Congress has waived sovereign immunity for all of his claims." Garcia v. United States, 709 F. Supp. 2d at 1138. See Bork v. Carroll, 449 F. App'x 719, 721 (10th Cir. 2011)("So it is that a plaintiff seeking to invoke the jurisdiction of the federal courts bears the burden of identifying an applicable statutory waiver of sovereign immunity when challenged to do so."); Summa v. United States, 936 F.2d 584, 1991 WL 114638, at *3 (10th Cir. 1991)(unpublished table decision)(holding in a Federal Tort Claims Act case that the "Plaintiffs bore the burden of proving that the district court had subject matter jurisdiction over their claims")(citing Miller v. United States, 710 F.2d 656, 662 (10th Cir. 1983)).

### 1.    General Sovereign Immunity Principles.

It is "axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." United States v. Mitchell, 463 U.S. 206, 212 (1983)(citations omitted). See FDIC v. Meyer, 510 U.S. 471, 475 (1994): United States v. Testan, 424 U.S. 392, 399 (1976); United States v. Sherwood, 312 U.S. 584, 586 (1941). As

with any jurisdictional issue, the party bringing suit against the United States bears the burden of proving that sovereign immunity has been waived.  See James v. United States, 970 F.2d 750, 753 (10th Cir. 1992).  A waiver of sovereign immunity cannot be implied and must be unequivocally expressed.  See United States v. Nordic Vill., Inc., 503 U.S. 30, 33-34 (1992); United States v. Mitchell, 445 U.S. 535, 538 (1980); United States v. Murdock Mach. & Eng'g Co. of Utah, 81 F.3d 922, 930 (10th Cir. 1996).  The United States' agencies also have sovereign immunity absent a waiver.  See FDIC v. Meyer, 510 U.S. 471, 475 (1994)("Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit").

**2.** **28 U.S.C. § 1346(a)(2).**

Section 1346(a)(2) provides:

(a)    The district courts shall have original jurisdiction, concurrent with the United States Court of Federal Claims, of:

. . .

(2)    Any other civil action or claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort, except that the district courts shall not have jurisdiction of any civil action or claim against the United States founded upon any express or implied contract with the United States or for liquidated or unliquidated damages in cases not sounding in tort which are subject to sections 7104(b)(1) and 7107(a)(1) of title 41.

28 U.S.C. § 1346(a)(2).  The Supreme Court of the United States has held that this statute "empowers district courts to award damages but not to grant injunctive or declaratory relief." Lee v. Thornton, 420 U.S. at 140.  The Tenth Circuit found the exercise of jurisdiction under this statute improper when the plaintiff "sought the equitable relief of rescission, while employing language designed to render the federal defendants liable in damages in the amount of the

promissory note."  Ortiz v. United States, 661 F.2d 826, 830-31 (10th Cir. 1981).  See McKay v. United States, 516 F.3d 848, 851 (10th Cir. 2008)("But this action involves a contractual, not a constitutional, obligation and plaintiff does not cite, nor have we found, any contract case holding that [28 U.S.C. § 1346(a)(2)] may be avoided . . . by forgoing the damages remedy the Act permits and seeking equitable relief it prohibits.").   "A plaintiff attempting to invoke the subject matter of the federal district courts bears the burden to establish his or her claim does not exceed the $10,000.00 jurisdictional limit established by" 28 U.S.C. § 1346(f).  Cortez v. EEOC, 585 F.Supp.2d 1273, 1288 (D.N.M. 2007)(Browning, J.).

    **3.**       **28 U.S.C. §§ 1346(f) and 2409a.**

    Section 1346(f) provides: "The district courts shall have exclusive original jurisdiction of civil actions under section 2409a to quiet title to an estate or interest in real property in which an interest is claimed by the United States."   28 U.S.C. § 1346(f).   Section 2409a provides in relevant part:

> The United States may be named as a party defendant in a civil action under this section to adjudicate a disputed title to real property in which the United States claims an interest, other than a security interest or water rights.  This section does not apply to trust or restricted Indian lands . . . .

28 U.S.C. § 2409a(a).  These statutes, together referred to as the Quiet Title Act, provide subject-matter jurisdiction and a waiver of sovereign immunity for quiet-title actions against the United States.  See Match-E-Ba-Nash-She-Wish Band of Pottawatomi Indians v. Patchak, 132 S. Ct. 2199, 2206 (2012)("From its title to its jurisdictional grant to its venue provision, the Act speaks specifically and repeatedly of 'quiet title' actions.  That term is universally understood to refer to suits in which a plaintiff not only challenges someone else's claim, but also asserts his own right to disputed property.")(citations omitted).

"Congress intended the QTA to provide the exclusive means by which adverse claimants could challenge the United States' title to real property."  United States v. Mottaz, 476 U.S. 834, 841 (1986).  The Tenth Circuit has stated that, "as its legislative history makes clear, the QTA applies even where the plaintiff claims an estate less than a fee simple . . . [such as] an easement."  McKay v. United States, 516 F.3d at 850 (alteration in original)(internal quotation marks omitted).

28 U.S.C. § 2409a(g) provides:

> Any civil action under this section, except for an action brought by a State, shall be barred unless it is commenced within twelve years of the date upon which it accrued. Such action shall be deemed to have accrued on the date the plaintiff or his predecessor in interest knew or should have known of the claim of the United States.

28 U.S.C. § 2409a(g).  As the Supreme Court has stated: "The limitations period is a central condition of the consent given by the Act."  United States v. Mottaz, 476 U.S. at 843.  A plaintiff's claim being timely under this statute of limitations is a jurisdictional prerequisite to suit under 28 U.S.C. § 2409a.  See Block v. North Dakota ex rel. Bd. of Univ. and Sch. Lands, 461 U.S. 273, 287 (1983)("Block v. North Dakota")("When waiver legislation contains a statute of limitations, the limitations provision constitutes a condition on the waiver of sovereign immunity."); Rio Grande Silvery Minnow (Hybognathus amarus) v. Bureau of Reclamation, 599 F.3d 1165, 1175 (10th Cir. 2010)("Timeliness under subsection [(g)][3] is a jurisdictional prerequisite to suit under section 2409a.")(alteration in original)(footnote added).

"The twelve-year limitations period is strictly construed in favor of the United States." Rio Grande Silvery Minnow (Hybognathus amarus) v. Bureau of Reclamation, 599 F.3d at 1176.

---

[3]An older version of 2409a had the statute-of limitations provision appear in subsection (f) of the statute as opposed to subsection (g).

The Tenth Circuit has "held that for purposes of determining when 'the claim' accrues under §
2409a(f), '[a]ll that is necessary is a reasonable awareness that the government claims some
interest adverse to the plaintiffs.'"  Vincent Murphy Chevrolet Co., Inc. v. United States, 766
F.2d 449, 452 (10th Cir. 1985).  "Knowledge of the claim's full contours is not required.  All that
is necessary is a reasonable awareness that the Government claims some interest adverse to the
plaintiff's."  Rio Grande Silvery Minnow (Hybognathus amarus) v. Bureau of Reclamation, 599
F.3d at 1176 (emphasis in original).

        Furthermore, "the United States need not assert a full legal title in the disputed property
for the limitations period to accrue; the claimed adverse interest in the title of the property
merely must be substantial enough to create a cloud on title."  Rio Grande Silvery Minnow
(Hybognathus amarus) v. Bureau of Reclamation, 599 F.3d at 1176.  The Tenth Circuit has held
that the knowledge of deed restrictions in place that benefitted the United States was sufficient to
trigger the running of the statute of limitations under 28 U.S.C. § 2409a(f).  See Vincent Murphy
Chevrolet Co., Inc. v. United States, 766 F.2d at 452 ("Appellants concede knowledge of a
'claim' -- the deed restrictions -- as early as 1965.  This is all that is necessary under §
2409a(f).").  The Tenth Circuit elaborated:

        While the Supreme Court in Block indicated that the statutes waiving
        immunity should not be construed in an unduly restrictive manner, it cautioned
        that these statutes could not be interpreted in such a manner as to "'extend the
        waiver beyond that which Congress intended.'"

        To hold that the twelve-year statute of limitations did not begin to run
        until conditions began changing would give rise to an interpretation of the term
        "claim" under § 2409a(f) which could extend the limitations period indefinitely.
        We cannot extend the waiver of immunity under the quiet title act beyond that
        which Congress could have intended and we refuse to do so without a clear
        expression of legislative intent.

        Appellants argue that in the twelve-year period following 1965, they
        would not have had a cause of action to quiet title since there would have been no

> justiciable controversy as the cause of action could not have accrued until conditions began changing.  While such argument evokes empathy, we do not believe that it comports with the limited waiver of sovereign immunity Congress intended, and in construing the statute of limitations strictly as a condition to the waiver of sovereign immunity, we must reject appellants' argument.

Vincent Murphy Chevrolet Co., Inc. v. United States, 766 F.2d at 452 (citations omitted).

Although 28 U.S.C. § 2409a contains a sovereign immunity waiver, it is limited to title claims that do not involve "trust or restricted Indian lands."  28 U.S.C. § 2409a(a).

> Thus, the Act's waiver of sovereign immunity is qualified by an exception for suits challenging title to lands held in trust for Indian tribes: "when the United States claims an interest in real property based on that property's status as trust or restricted Indian lands, the Quiet Title Act does not waive the Government's immunity."

Governor of Kan. v. Kempthorne, 516 F.3d 833, 841 (10th Cir. 2008)(quoting Neighbors for Rational Dev., Inc. v. Norton, 379 F.3d 956, 961 (10th Cir. 2004)).

The Supreme Court has emphasized the Indian-land exception's importance: "If we were to allow claimants to try the Federal Government's title to land under an officer's-suit[4] theory, the Indian land exception to the QTA would be rendered nugatory."  Block v. North Dakota, 461 U.S. at 285 (footnote added).  Thus, "when the United States claims an interest in real property based on that property's status as trust or restricted Indian lands, the Quiet Title Act does not waive the government's immunity."  United States v. Mottaz, 476 U.S. at 843.  See Wildman v.

---

[4]An "officer's suit" was a means for obtaining relief in a title dispute with the federal government before Congress passed the Quiet Title Act.  Block v. North Dakota, 461 U.S. at 281.

> In the typical officer's suit involving a title dispute, the claimant would proceed against the federal officials charged with supervision of the disputed area, rather than against the United States.  The suit would be in ejectment or, as here, for an injunction or a writ of mandamus forbidding the defendant officials from interfering with the claimant's property rights.

Block v. North Dakota, 461 U.S. at 281.

United States, 827 F.2d 1306, 1309 (9th Cir. 1987)("The ordinary reason[s] for enforcing sovereign immunity . . . are reinforced when Indian lands are in question."). "As long as the United States has a 'colorable claim' to a property interest based on that property's status as trust or restricted Indian lands, the QTA renders the government immune from suit." State of Alaska v. Babbitt, 75 F.3d 449, 451-52 (9th Cir. 1996).

"Because § 2409a limits the sovereign immunity of the United States, it must be interpreted according to federal law." Rio Grande Silvery Minnow (Hybognathus amarus) v. Bureau of Reclamation, 599 F.3d at 1177. "However, federal courts may properly look to state law as an aid in determining the application of statutory language to specific facts." Rio Grande Silvery Minnow (Hybognathus amarus) v. Bureau of Reclamation, 599 F.3d at 1177. "In particular, 'questions involving ownership, transfer and title to real estate have traditionally been resolved according to the laws of the state where the realty is located.'" Rio Grande Silvery Minnow (Hybognathus amarus) v. Bureau of Reclamation, 599 F.3d at 1177. "But 'such state law should be compatible with the purpose of [the legislation so as] to find the rule that will best effectuate the federal policy.'" Rio Grande Silvery Minnow (Hybognathus amarus) v. Bureau of Reclamation, 599 F.3d at 1177 (alteration in original).

## ANALYSIS

First, Northern New Mexicans lacks standing to pursue its takings claim and quiet title claim. Second, because the United States has not consented to be sued, the Court lacks jurisdiction to hear Northern New Mexicans' quiet title action. Third, as the Quiet Title Act establishes the exclusive remedy for claims challenging the United States' interests in real property, Northern New Mexicans' remaining claims are barred.

## I.   THE COURT LACKS JURISDICTION OVER NORTHERN NEW MEXICANS' TAKINGS CLAIM AND QUIET TITLE CLAIM.[5]

Whether a party has Article III standing is a "threshold jurisdictional question" that a court must decide before it may consider the merits.  Steel Co. v. Citizens for a Better Env't, 523 U.S. at 102.   As an association, Northern New Mexicans must either satisfy Article III's requirements with respect to its own harm or satisfy the Supreme Court's three-part test governing associational standing.   See Kan. Health Care Ass'n, Inc. v. Kan. Dep't of Soc. & Rehab. Servs., 958 F.2d 1018, 1021 (10th Cir. 1992).   Northern New Mexico does not allege that it has suffered any harm itself.   Rather, it alleges that its members have suffered injuries.   See Response at 21 (noting that the "Plaintiff is asserting association standing"); Complaint ¶ 34, at 7 ("Plaintiff's members have been harmed by the actions of Defendants as their property values have diminished."); id. ¶ 35, at 7 ("Defendants' actions have prevent [sic] Plaintiff [sic] members from securing financing to purchase, sell or refinance their real property."); id. ¶ 36, at 7 ("Plaintiff [sic] members have been harmed and are at imminent risk of irreparable harm from Defendants' unlawful conduct.").[6]   To sue on behalf of its members, Northern New Mexicans must show that: (i) its members have standing to sue; (ii) the interests at stake are relevant to the

---

[5]At the hearing, Northern New Mexicans agreed that it could not pursue its quiet-title claim and stated that it wanted to voluntarily dismiss it.   See Tr. at 27:7-15 (Richards); id. at 31:10-15 (Richards).

[6]Some of the Complaint's allegations suggest that Northern New Mexicans owns property served by the alleged rights-of-way.   See, e.g., Complaint ¶ 19, at 4 (alleging that the disputed rights-of-way "provide the sole means of access to Plaintiff's fee simple real property").   Northern New Mexicans admits, however, that it is "a duly registered 501(c)(3) nonprofit corporation whose members are property owners in New Mexico that are served by the rights of way."   Complaint ¶ 1, at 2.   The Complaint does not identify any property that it owns, so it does not have standing to assert its own right to bring the Complaint's claims.   See Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv., No. CIV 12-0069 JB/KBM, 2015 WL 6389741, at *18 (D.N.M. Sept. 30, 2015)("It is a long-settled principle that standing cannot be inferred argumentatively from averments in the pleadings but rather must affirmatively appear in the record.")(quoting Phelps v. Hamilton, 122 F.3d 1309, 1326 (10th Cir. 1997)).

organization's purpose; and (iii) neither the claim asserted, nor the relief requested, requires the individual members to participate in the lawsuit.  See Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv., 2015 WL 6389741, at *37 (citing Friends of the Earth v. Laidlaw Envtl. Serv., 528 U.S. at 181, and Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 343 (1977)("Hunt")).

Turning to the first prong, Northern New Mexicans asserts that its individual members have standing.  See Response at 21.  It argues that its members, New Mexico property owners, suffer a concrete injury in that their property values have diminished.  See Complaint ¶ 43, at 8; Response at 21.  It contends that the Defendants' December 6 Letter caused this injury by clouding their title and diminishing their property values.  See Complaint ¶ 43, at 8.  Finally, it asserts that a declaratory judgment or injunction barring the Defendants from interfering with their property rights could redress this injury.  See Complaint ¶ 46, at 8; id. ¶¶ 1-5, at 10-11. Northern New Mexicans identifies the members that own property that the Defendants' actions allegedly harmed.  See Plaintiff's Initial Disclosures Pursuant to Fed. R. Civ. P., Rule 26(A)(1), filed November 10, 2015 (Doc. 22-1)(describing "members of Northern New Mexicans Protecting Land Water and Rights[,] identifying their membership interests and attesting to harm resulting from the BIA's action in issuing the December 6, 2013, Decision of trespass")[7];

---

[7]The Court observes that the Defendants -- not Northern New Mexicans -- provided the Court with the list of members with property that the Defendants' actions allegedly affects. Nevertheless, the Court can examine the documents before the Court to determine standing.  See Apex Digital, Inc. v. Sears, Roebuck & Co., 572 F.3d 440, 444 (7th Cir. 2009)(stating that district courts "may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists").

Affidavits of Property Owners, filed December 22, 2015 (Doc. 30-2).[8]  Accordingly, Northern

New Mexicans "specifically 'identif[ies] members who have suffered the requisite harm.'"

Chamber of Commerce of U.S. v. E.P.A., 642 F.3d 192, 199-200 (D.C. Cir. 2011)(quoting

Summers v. Earth Island Inst., 129 S. Ct. 1142, 1151-52 (2009)).  See Am. Chem. Council v.

Dep't of Transp., 468 F.3d 810, 820 (D.C. Cir. 2006)(holding that "an organization bringing a

claim based on associational standing must show that at least one specifically-identified member

has suffered an injury-in-fact. . . .  At the very least, the identity of the party suffering an injury

in fact must be firmly established.").  Northern New Mexicans, thus, shows that its members

have standing individually.

Northern New Mexicans also satisfies the Hunt test's second prong.  Its asserted purpose

is "to assist the community with protecting their rights to land and water."  Response at 21.  With

respect to the third prong, however, Northern New Mexicans does not demonstrate associational

standing on its Takings Clause action or its quiet-title claim.  The Court addresses the takings

claim first.

The Tenth Circuit has stated that an association usually lacks standing to pursue damages

claims on its members' behalf.  See In re Integra Realty Res., Inc., 262 F.3d 1089, 1098 n.5 (10th

---

[8]In the affidavits, the members declare that they own "real property located in Santa Fe County, New Mexico and served for ingress and egress by County Roads 84, 84A, 84B, 84C, 84D and Sandy Way Road."  Declaration of Dan S. Chaney A Member of the Northern New Mexicans Protecting Land Water and Rights Regarding Lands Affected by the BIA's Letter of December 6, 2013, filed December 22, 2015 (Doc. 30-2)("Chaney Affidavit").  The affidavit states that Chaney has "personally been affected as ingress and egress to [his] fee simple residence real property has been clouded by the BIA's December 6, 2013 letter asserting that the public roads serving my property are in trespass."  Chaney Affidavit ¶ 4, at 2.  It avers that without access to his property, he "will be unable to sell or finance [his] property in the future. . . .  The actions of Defendants have directly impacted the private property interests of our membership and my private property rights through the loss of access and diminution of private property values."  Chaney Affidavit ¶¶ 5-6, at 2.

Northern New Mexicans provides ten more affidavits making similar allegations.

Cir. 2001).   Accordingly, associations usually lack standing to bring takings claims for "just compensation."   Wash. Legal Found. v. Legal Found. of Wash., 271 F.3d 835, 849-50 (9th Cir. 2001)("Because the appropriate relief -- determining what, if any, just compensation is due to the owner of the property taken -- necessarily requires the participation of the individual members, Washington Legal Foundation does not have representational standing to pursue a Fifth Amendment taking claim."), aff'd on other grounds, 538 U.S. 216 (2003).  See United Food and Commercial Workers Union Local 751 v. Brown Grp., Inc., 517 U.S. 544, 554 (1996)(stating that the Supreme Court's "precedents have been understood to preclude associational standing when an organization seeks damages on behalf of its members"); Rent Stabilization Ass'n of City of New York v. Dinkins, 5 F.3d 591, 596 (2d Cir. 1993); Comm. for Reasonable Regulation of Lake Tahoe v. Tahoe Reg'l Planning Agency, 365 F. Supp. 2d 1146, 1165 (D. Nev. 2005)(holding that "the Committee does not have associational standing to assert an as-applied takings claim on behalf of its members . . . [because] this type of taking claim must be raised by an individual homeowner under the facts of this case").   Because Northern New Mexicans pursues a takings claim, which provides damages as relief in as-applied challenges when the plaintiffs have not shown that compensation is unavailable, it therefore lacks standing on this claim.  See Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1019 (1984)(holding that a challenge to the constitutionality of a statute seeking an injunction was not ripe because the Tucker Act was available as a remedy for any uncompensated taking); Alto Eldorado Partners v. City of Santa Fe, 644 F. Supp. 2d 1313, 1342-43 (D.N.M. 2009)(Browning, J.)(concluding that plaintiffs may pursue injunctive relief in some takings claims, but not where they have not yet sought compensation available to them); United Food and Commercial Workers Union Local 751 v. Brown Grp., Inc., 517 U.S. at 554; In re Integra Realty Res., Inc., 262 F.3d at 1098.

Northern New Mexicans argues that it has standing, because it does not seek damages. See Response at 21. Instead, it contends that it seeks a declaratory judgment and an injunction. See Response at 21. Even though Northern New Mexicans argues that it does not seek damages, its argument does not allow it to pursue its takings claim, because it has not shown that the government has denied its members just compensation, making its claim not yet ripe.[9] In fact, it admits that no taking has yet occurred. Tr. at 25:10-13 (Richards). "The Fifth Amendment does not proscribe the taking of property; it proscribes taking without just compensation." Williamson Cty. Regional Planning Comm'n v. Hamilton Bank of Johnson City, 473 U.S. 172, 194 (1985). Accordingly, "taking claims against the Federal Government are premature until the property owner has availed itself of the process provided by the Tucker Act." Williamson Cty. Regional Planning Comm'n v. Hamilton Bank of Johnson City, 473 U.S. at 195.

Similarly, "if a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure and been denied just compensation." Williamson Cty. Regional Planning Comm'n v. Hamilton Bank of Johnson City, 473 U.S. at 195. See First English Evangelical Lutheran Church of Glendale v. Cty. of L.A., 482 U.S. 304, 314-15 (1987)(stating that the Fifth Amendment "makes clear that it is designed not to limit the governmental interference with

_____

[9]The Court recognizes that facial challenges to regulations that allegedly constitute a taking need not first seek compensation. See Alto Eldorado P'ship v. Cty. of Santa Fe, 634 F.3d 1170, 1175-76 (10th Cir. 2011). The Court determines, however, that Northern New Mexicans' claim is an as-applied challenge, because it argues that the Defendants' actions "deprive Plaintiff's members of access to members' real property . . . [and] constitutes a taking of Plaintiff's property for which compensation is due." Complaint ¶ 48, at 8. See Alto Eldorado P'ship v. Cty. of Santa Fe, 634 F.3d at 1175 (concluding that the plaintiffs' claim was an as-applied challenge because they alleged that the government ordinance did not provide for any compensation for the burdens it placed on them, which therefore constituted an illegal taking of property). Northern New Mexicans does not challenge the December 6 Letter's validity, which is "properly brought as a due process claim." Alto Eldorado P'ship v. Cty. of Santa Fe, 634 F.3d at 1175.

property rights *per se*, but rather to secure *compensation* in the event of otherwise proper interference amounting to a taking"); <u>Kirby Forest Indus., Inc. v. United States</u>, 467 U.S. 1, 5 (1984)).  The Supreme Court of the United States has stated that, "because the Constitution does not require pretaking compensation, and is instead satisfied by a reasonable and adequate provision for obtaining compensation after the taking, the State's action here is not 'complete' until the State fails to provide adequate compensation for the taking." <u>Williamson Cty. Regional Planning Comm'n v. Hamilton Bank of Johnson City</u>, 473 U.S. at 195.  Here, Northern New Mexicans has not shown that compensation is unavailable or inadequate under the Tucker Act or any other procedure.  In fact, it admits that compensation is available, but concedes that it has not sought compensation.  <u>See</u> Tr. at 26:8-9 (stating that compensation will be available if they can show there has been a taking); <u>id.</u> at 26:13-15 (Richards)(asserting that each member could bring an individual claim for compensation); <u>id.</u> at 33:10-17 (Richards)("If this Court were to provide that type of declaration then the individuals who are harmed in the future by the actual taking could go forward and bring a compensatory damages claim."); <u>id.</u> at 37:11-13 (Richards)(admitting that it has never sought compensation in this case or any other case). "[U]ntil it has utilized that procedure, its taking claim is premature." <u>Williamson Cty. Regional Planning Comm'n v. Hamilton Bank of Johnson City</u>, 473 U.S. at 197.

Northern New Mexicans admitted at the hearing that, currently, it has no takings claim. <u>See</u> Tr. at 32:9-12 (Richards)("We are not yet arguing there has been an absolute taking.  We're arguing that the actions the Government is currently engaging in may result in a taking.").  It conceded that no taking had yet occurred.  <u>See</u> Tr. at 32:9-12 (Richards).  Rather, it argued, a taking would likely occur in the future.  <u>See</u> Tr. at 32:9-12 (Richards).  On that basis, therefore, it asked the Court to grant it declaratory and injunctive relief.  <u>See</u> Tr. at 33:5-10 (Richards).

Northern New Mexicans observed in passing that plaintiffs cannot make a takings claim until they are denied compensation.  See Tr. at 32:12-21 (Richards)("If you don't get compensation, then you can bring a takings claim but until you are denied, sometimes in state court, sometimes in Federal Court, you just don't get to make a takings claim.").  At the same time, however, Northern New Mexicans stated that its members could seek compensation under the Tucker Act for their takings claims.  See Tr. at 33:10-17 (Richards)("If this Court were to provide that type of declaration then the individuals who are harmed in the future by the actual taking could go forward and bring a compensatory damages claim.").  In other words, it admitted that compensation is available.  See Tr. at 33:10-25 (Richards).  As the Court stated above, it will not grant declaratory and injunctive relief where compensation is available to the plaintiff.

As to the quiet-title claim, Northern New Mexicans also lacks standing.  While it is somewhat unclear, Northern New Mexicans appears to raise two theories for its quiet-title claim: (i) that its members have a right to use the roads to which the County of Santa Fe holds title, see Complaint ¶ 39, at 7; and (ii) that its members individually own implied easements, see Complaint ¶ 42, at 7-8.[10]  The Court lacks jurisdiction under both theories.  First, if Northern New Mexicans seeks to quiet title in the County of Santa Fe's name while asserting its members' interests in using the roads, Northern New Mexicans lacks statutory standing.  See Kinscherff v. United States, 586 F.2d 159, 160-61 (10th Cir. 1978); Sw. Four Wheel Drive Ass'n v. Bureau of Land Mgmt., 363 F.3d 1069, 1071 (10th Cir. 2004).  The Tenth Circuit has stated: "Members of the public as such do not have a 'title' in public roads.  To hold otherwise would signify some

---

[10]The Court notes that, for the first time, Northern New Mexicans asserted at the hearing that it wanted to voluntarily dismiss its quiet-title claim, because it was not a proper plaintiff.  See Tr. at 27:7-15 (Richards); id. at 31:10-15.  Although it argued in its Complaint and its Response that its members had standing because they allegedly owned easements, see Response at 16, it admitted at the hearing that its members could not claim title to these roads.  See Tr. at 27:7-15 (Richards).

degree of ownership as an easement.  It is apparent that a member of the public cannot assert such an ownership in a public road."  Kinscherff v. United States, 586 F.2d at 160-61.  Here, Northern New Mexicans states that it "is not alleging the rights vested in the state of New Mexico and the County of Santa Fe, but are instead alleging . . . the adverse claim to use of those public rights."  Response at 15.  See Response at 21 ("Plaintiff is seeking to quite [sic] title to common property . . . .").  As the Tenth Circuit has stated, "the 'interest' plaintiffs seek to assert as part of the public is not of such a nature to enable them to bring a suit to quiet title."  Kinscherff v. United States, 586 F.2d at 161.  Accordingly, Northern New Mexicans "cannot establish a claim under the Quiet Title Act and thus it cannot bring suit against the United States."  Sw. Four Wheel Drive Ass'n v. Bureau of Land Mgmt., 363 F.3d at 1071.  If Northern New Mexicans "cannot state a claim within the terms of the Act's provisions, the federal courts lack jurisdiction over its suit."  Sw. Four Wheel Drive Ass'n v. Bureau of Land Mgmt., 363 F.3d at 1071 (citing Warren v. United States, 234 F.3d 1331, 1332 (D.C. Cir. 2000)).

Under Northern New Mexicans' other theory, that its members individually own implied easements, see Complaint ¶ 42, at 7-8, it lacks standing for the same reason it lacks standing on its Takings Clause claim: litigating the claim requires individual member participation.  When litigating the claim or providing relief requires broad individual participation, the Tenth Circuit denies standing on Hunt's third prong.  To illustrate, in Kansas Health Care Association, Inc. v. Kansas Department of Social and Rehabilitation Services, the Tenth Circuit concluded that the plaintiff organization lacked associational standing because the claims asserted would have required the association's individual members to participate extensively.  See 958 F.2d at 1021-22.  The organization sought only an injunction -- not individualized damages for each of its members.  See 958 F.2d at 1021.  On this basis, the district court determined that "individual

participation of the providers will not be required with respect to the injunctive relief sought by plaintiffs." 958 F.2d at 1022. The Tenth Circuit stated that even if the district court were correct in that respect, "that determination alone was insufficient to support a conclusion that plaintiffs meet the third standing prerequisite from *Hunt*. Under the *Hunt* test, an association has standing only if 'neither *the claim asserted* nor the relief requested requires the participation of individual members in the lawsuit.'" 958 F.2d at 1022 (emphasis in original). Accordingly, the Tenth Circuit proceeded to determine whether the plaintiffs' remaining claims would require individualized participation. See 958 F.2d at 1022.

First, the Tenth Circuit considered the plaintiffs' claim that the state's Medicaid reimbursement rates were not reasonable and adequate to meet their costs. See 958 F.2d at 1022. It observed that, in "some circumstances," a court may be able to determine whether reimbursement rates are reasonable without individualized proof. 958 F.2d at 1022. In the case at hand, however, it determined that the facts did not lend themselves to a summary conclusion. See 958 F.2d at 1022. It stated: "Instead, in order to resolve plaintiffs' claims, we will be required to examine evidence particular to individual providers." 958 F.2d at 1022. The Tenth Circuit therefore concluded that proving the claim "will necessarily require individual participation of the associations' members." 958 F.2d at 1022. Second, it considered the plaintiffs' claim that the defendants failed to adequately consider the costs that efficiently operated hospitals incur and reasonable payment rates. See 958 F.2d at 1023. For the same reasons stated above, the Tenth Circuit concluded that proving this claim would require the plaintiffs to show that the defendants failed to adequately consider costs for each health care provider, yet the individual health care providers were not parties. See 958 F.2d at 1023. The Tenth Circuit noted, however, that the plaintiffs could have standing if the plaintiffs could have

shown that "the state made absolutely no findings or findings that were clearly inadequate" for all of the healthcare providers.  958 F.2d at 1023.  Because the plaintiffs did not make that showing, the Tenth Circuit determined that the organizations lacked standing, because litigating their claims would require their members to participate.  See 958 F.2d at 1023.

This case leads to the same conclusion.  Northern New Mexicans asserts that its members have easements and that it "is seeking [to] protect its claims not held by the city, New Mexico, or the County of Santa Fe."  Response at 16.  Like in Kansas Health Care Association, Inc. v. Kansas Department of Social and Rehabilitation Services, the Court cannot determine who holds title to the disputed land without the individual member's participation.  Demonstrating that each individual member owns an easement requires each individual member to participate to determine his or her own right to access the disputed roads.  See Catron Cty. v. United States, 934 F. Supp. 2d 1298, 1307-08 (D.N.M. 2013)(Vazquez, J.), declined to follow on other grounds, Kane Cty. v. United States, 772 F.3d 1205 (10th Cir. 2014).

The Quiet Title Act's "pleading with particularity" requirement, 28 U.S.C. § 2409a(d), requires specific "allegations identifying which entity held title to the alleged right-of-way . . . , when the land was transferred to the federal government, or how title was subsequently transferred from that entity to [plaintiff]."  Catron Cty. v. United States, 934 F. Supp. 2d at 1307-08.  Litigating each member's right-of-way claims would require highly individualized allegations and proof for each claimant.  Compare Friends for Am. Free Enterprise Ass'n v. Wal-Mart Stores, Inc., 284 F.3d 575 (5th Cir. 2002)(rejecting associational standing, because the plaintiff's common-law tortious interference claims were wholly fact-specific as to the individual members).  Moreover, if Northern New Mexicans' members were to prevail on their quiet-title claims, the United States would have the option of retaining possession of the property "upon

payment to the person determined to be entitled thereto of an amount which upon such election the district court in the same action shall determine to be just compensation."  28 U.S.C. § 2409a(b).  As with Northern New Mexicans' takings claim, the quiet-title claim could similarly involve damages.  Accordingly, the Court cannot determine whether the individuals have these easements without requiring individuals to participate.  The Court therefore lacks jurisdiction to hear Northern New Mexicans' quiet-title claim as well as its takings claim.

## II.   THE COURT LACKS JURISDICTION TO HEAR NORTHERN NEW MEXICANS' QUIET-TITLE CLAIM.

Northern New Mexicans' second cause of action seeks to "quiet title to Plaintiff's vested rights-of-way property rights for ingress and egress to their fee title property as against Defendants."  Complaint ¶ 44, at 8.  It alleges that the rights-of-way to which it seeks to quiet title are on roads "commonly known as County Roads 84, 84A, 84B, 84C, 84D, and Sandy Way road."  Complaint ¶ 40, at 7.  It states that these rights-of-way "were conferred pursuant to [R.S. 2477,]" or that its members "prescriptively acquired a corresponding non-possessory interest in land as an implied easement for ingress and egress to fee title property."  Complaint ¶¶ 41-42, at 7-8.

The Court has jurisdiction over cases in which the United States is a defendant only when the United States consents to be sued.  See Garcia v. United States, 709 F. Supp. 2d at 1137-38.  "When the United States consents to be sued, the terms of its waiver of sovereign immunity define the extent of the court's jurisdiction."  United States v. Mottaz, 476 U.S. at 841.  Northern New Mexicans has not demonstrated that the United States has consented to be sued.  See Garcia v. United States, 709 F. Supp. 2d at 1138 (stating that the "plaintiff bears the burden of proving that Congress has waived sovereign immunity for all of his claims").

A.   **THE COURT LACKS JURISDICTION TO HEAR TITLE DISPUTES INVOLVING TRUST OR RESTRICTED INDIAN LANDS.**

As the basis for its alleged title dispute, Northern New Mexicans identifies the BIA's December 6 Letter, which asserts the United States' interest in protecting the Indian trust lands of the San Ildefonso Pueblo.  See December 6 Letter at 2-5.  The Supreme Court of the United States has recognized that the New Mexico Pueblos are "subject to the legislation of Congress enacted in the exercise of the government's guardianship over those tribes and their affairs." United States v. Sandoval, 231 U.S. 28, 48 (1913).  "The Indians of the [New Mexico] pueblo are wards of the United States, and hold their lands subject to the restriction that the same cannot be alienated in any wise without its consent."   United States v. Candelaria, 271 U.S. 432, 443 (1926).  See United States v. Thompson, 708 F. Supp. 1206, 1209 (D.N.M. 1989)(Conway, J.)(stating that "[i]t was not until 1926 that the Supreme Court expressly held that the Nonintercourse Act applied to the Pueblo Indians"), aff'd, 941 F.2d 1074 (10th Cir. 1991).  "The Indian Nonintercourse Act, 25 U.S.C. § 177, . . . . acknowledges and guarantees the Indian tribes' right of possession [of Indian lands], . . . and imposes on the federal government a fiduciary duty to protect the lands covered by the Act."   U.S. for & on Behalf of Santa Ana Indian Pueblo v. Univ. of N.M., 731 F.2d 703, 706 (10th Cir. 1984)(citations omitted). "Congress extended the Nonintercourse Act" to the New Mexico Pueblos in 1851.  See U.S. for & on Behalf of Santa Ana Indian Pueblo v. Univ. of N.M., 731 F.2d at 706.  In accordance with this law, the San Ildefonso Pueblo is a tribal entity for which the United States recognizes its trust responsibility.  See 46 Fed. Reg. 35360, 35362 (July 8, 1981).

The United States therefore asserts an interest in the San Ildefonso Pueblo as "trust or restricted Indian lands."  28 U.S.C. § 2409a(a).  As further confirmation, the December 6 Letter, which Northern New Mexicans alleges clouds its members' titles, states: "The County is in

direct violation of the federal requirements governing the use of <u>Indian trust lands</u>," because "[n]o easement or Rights-of-way exist for County Road 84 and the side roads <u>on tribal trust land of the Pueblo of San Ildefonso</u>."  December 6 Letter at 2 (emphasis added).  <u>See id.</u> at 1 (stating that, because the county roads are in trespass on the Pueblo, the County of Santa Fe is "in violation of the federal requirements in the use of Indian trust land").  Northern New Mexicans attaches a Geological Survey map, which the United States Geological Survey and the National Oceanic and Atmospheric Administration published, and a Google Earth image, both showing that the roads are located on the "San Ildefonso Indian Reservation."  December 6 Letter at 3-5. Moreover, it concedes that its alleged rights-of-way sit on Indian lands when it argues that the BIA "acted arbitrarily and capriciously, seeking to extinguish these public property rights/easements <u>that cross tribal land</u>."  Complaint ¶ 19, at 4 (emphasis added).  Because Northern New Mexicans' quiet-title claim seeks to quiet title against the United States' interest in "trust or restricted Indian lands," the Quiet Title Act's Indian lands exception to the United States' waiver of sovereign immunity bars its claim.  Accordingly, the United States has not consented to be sued, and the Court therefore lacks jurisdiction.

Northern New Mexicans argues that, to invoke the Quiet Title Act's Indian lands exception, the United States must definitively prove that the roads are trusts or restricted Indian lands.  <u>See</u> Response at 10.  The United States does not bear that burden.  Otherwise, the exception would serve little purpose.  Plaintiffs could always dispute whether the United States holds the lands in trust, and therefore whether the Indian-lands exception applies; this dispute would collapse the waiver's applicability into the merits decision of who owns title -- the United States in trust or the plaintiff.  <u>See</u> <u>Iowa Tribe of Kan. and Neb. v. Salazar</u>, 607 F.3d at 1231. For this reason, the Supreme Court has rejected Northern New Mexicans' theory: "When the

United States <u>claims</u> an interest in real property based on that property's status as trust or restricted Indian lands, the Quiet Title Act does not waive the Government's immunity." <u>United States v. Mottaz</u>, 476 U.S. at 843 (emphasis added). It recognized that, if the law were otherwise, "[a] unilateral waiver of the Federal Government's immunity would subject those lands to suit without the Indians' consent." <u>United States v. Mottaz</u>, 476 U.S. at 843 n.6.

The Tenth Circuit has confirmed that the United States' "claim" to Indian trust lands need only be "colorable" for the United States to invoke sovereign immunity. <u>Iowa Tribe of Kan. and Neb. v. Salazar</u>, 607 F.3d at 1231. In <u>Iowa Tribe of Kansas and Nebraska v. Salazar</u>, the plaintiffs raised similar arguments to those that Northern New Mexicans raises here: that "the Shriner Tract is not in trust because the Secretary's decision regarding acquisition was not authorized by law." 607 F.3d at 1231. The Tenth Circuit concluded that the Quiet Title Act's immunity applies whenever the United States claims an interest in Indian lands, without regard to the claim's ultimate validity. <u>See</u> 607 F.3d at 1231 (stating that "the Secretary need only make a colorable claim that the land is held in trust on behalf of an Indian tribe"). "The very purpose of the doctrine [of sovereign immunity] is to prevent a judicial examination of the merits of the government's position." 607 F.3d at 1232 (alterations in original)(quoting <u>Wildman v. United States</u>, 827 F.2d 1306 (9th Cir. 1987)).

The Tenth Circuit relied on <u>Wildman v. United States</u>, in which the Ninth Circuit concluded that

> [n]othing in the statute or its history suggests that the United States was to be put to the burden of establishing its title when it has a colorable claim and has chosen to assert its immunity on behalf of land of which the government declares that it is the trustee for Indians.

827 F.2d at 1309. In <u>Wildman v. United States</u>, the Ninth Circuit noted that the United States had previously litigated whether the disputed land, an island in the Colorado River, was a part of

Arizona, in which case the land belonged to the Indian tribe, or part of California.  See 827 F.2d at 1309 (citing Sherrill v. McShan, 356 F.2d 607, 611 (9th Cir. 1966)).  In the earlier litigation, the United States District Court for the District of Arizona held that it lacked jurisdiction, because the island was part of California.  See Sherrill v. McShan, 356 F.2d at 610-11.  Despite this adverse determination, the Ninth Circuit in Wildman v. United States determined that the United States had a colorable claim that the land was Indian land, even though former courts had determined that the land was part of California.  See 827 F.2d at 1309 (citing Sherrill v. McShan, 356 F.2d at 610-11).

The Ninth Circuit made similar findings in a case where the plaintiffs alleged nearly identical claims to the ones that Northern New Mexicans does here.  In Alaska v. Babbitt, 75 F.3d 449, 451-52 (9th Cir. 1996), and Alaska v. Babbitt ("Albert Allotment"), 38 F.3d 1068, 1076 (9th Cir. 1994), Alaska contended that it had a right-of-way to build a highway over alleged Indian land.  See 75 F.3d at 450-51.  Like Northern New Mexicans does here, Alaska argued that its right-of-way did not constitute Indian lands.  See 75 F.3d at 451.  The Ninth Circuit explained that "'[t]he QTA's limitations on actions challenging the United States' assertions of title apply without regard to the ultimate validity of those assertion. . . .  [T]he immunity of the government applies whether the government is right or wrong.'"  Alaska v. Babbitt, 75 F.3d at 452 (quoting Albert Allotment, 38 F.3d at 1076).  "To the extent that the QTA allows any inquiry on the merits, that inquiry can extend no further than a determination that the government had some rationale for its claim."  75 F.3d at 452.  Here, the United States claims an interest in these roads "based on [the roads'] status as trust or restricted lands."  MTD at 14-15.  It demonstrates the basis for its interest clearly.  Accordingly, the Court lacks jurisdiction to hear this claim.

Northern New Mexicans attempts to escape the Quiet Title Act's limitations by arguing that it does not claim an interest in restricted Indian lands, even though its members do.  See Response at 8-9.  It cites to Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak, 132 S. Ct. 2199 (2012), in which the Supreme Court held that the Quiet Title Act did not bar the plaintiff's suit, because it did not "claim any competing interest in the" property at issue.  132 S. Ct. at 2206.  The plaintiff lived near the land that the United States acquired on behalf of an Indian tribe so that it could open a casino.  See 132 S. Ct. at 2202.  Although the plaintiff alleged that the United States lacked authority to take title to the land, he did not assert any ownership interest in the land.  See 132 S. Ct. at 2202-03.  Instead he "allege[d] economic, environmental, and aesthetic harms from the casino's operation."  132 S. Ct. at 2203.  The Supreme Court agreed, however, that if the plaintiff had sued under the APA "claiming that he owned the [] Property and that the Secretary therefore could not take it into trust . . . .  [t]he QTA would bar that suit . . . ."  132 S. Ct. at 2205.

Northern New Mexicans' case is similar to the hypothetical APA suit the Supreme Court described.  Northern New Mexicans' Complaint repeatedly alleges that its members hold property interests adverse to the United States.  See Complaint ¶¶ 1, 12-13, 21-22, 26, 30, 31, 32, 33, 39, 42-46, 48-50, 52-53, 58, 60, 61, at 2-10.  Nevertheless, it argues that it is not an "adverse claimant," because it "does not allege a cloud on *its* title to the BIA-identified rights-of-way."  Response at 8 (emphasis in original).  Rather, it contends that the BIA has clouded title to its members' property.  See Response at 8-9.  Northern New Mexicans' argument does not distinguish its case from the numerous cases in which plaintiffs assert an ownership interest.

Unless an association asserts a direct harm, it can bring only derivative claims -- the claims of its members, who would have standing in their own right.  See Kan. Health Care

Ass'n, Inc. v. Kan. Dep't of Soc. & Rehab. Servs., 958 F.2d at 1021.  Here, Northern New Mexicans asserts its members' adverse claims.  Although the organization itself may not assert title to the disputed roads, it asserts that its members have such easements and property interests sufficient to provide standing.  See Response at 8-14.  It admits that these members are adverse claimants: it "alleg[es] under *Patchak* the adverse claim to use of the public rights."  Response at 15.  See Response at 21 (stating that its "membership is [sic] standing individually to pursue adverse claims under *Padgett* [sic] as a member of the public with an adverse claim").  Northern New Mexicans may not argue simultaneously that: (i) its members have adverse property interests in the roads, thereby giving the organization standing; and (ii) that it does not have any property interest in the disputed roads, thereby allowing it to pursue its quiet title claims. Allowing litigants to do so would defeat the Quiet Title Act's Indian lands exception, because any property owner could form an organization to sue on its own behalf.  In conclusion, the United States has not waived sovereign immunity, so the Court lacks jurisdiction to hear Northern New Mexicans' quiet-title claim.

### B.   THE COURT ALSO LACKS JURISDICTION, BECAUSE NORTHERN NEW MEXICANS DOES NOT PLEAD WITH PARTICULARITY.

The Court also lacks jurisdiction, because Northern New Mexicans has not complied with the Quiet Title Act's pleading requirements.  The pleading requirements are a prerequisite to the United States' waiver of sovereign immunity, so Northern New Mexicans must comply with 28 U.S.C. § 2409a(d) to establish this Court's jurisdiction.  See Catron Cty. v. United States, 934 F. Supp. 2d at 1307 ("As a condition on the United States' waiver of sovereign immunity, a failure to satisfy these pleading requirements is a jurisdictional bar to a plaintiff's quiet title claim.")(citing United States v. Mottaz, 476 U.S. at 843); Washington Cty. v. United States, 903 F. Supp. 40, 42 (D. Utah 1995)(Sam, J.)(holding that, by failing to plead its quiet-title claims

with particularity, the plaintiff county "has failed to comply with the conditions and requirements of 28 U.S.C. § 2409a by which the United States consents to suit in quiet title actions").  To satisfy the Quiet Title Act's sovereign immunity waiver, plaintiffs must plead their claims against the United States with greater specificity than the Federal Rules of Civil Procedure require.  See 28 U.S.C. § 2409a(d).  A complaint seeking to quiet title against the United States must identify the plaintiff's property claims, as well as the United States' adverse claims in that same property.  See 28 U.S.C. § 2409a(d).  Specifically, "[t]he complaint shall set forth with particularity the nature of the right, title, or interest which the plaintiff claims in the real property, the circumstances under which it was acquired, and the right, title, or interest claimed by the United States."  28 U.S.C. § 2409a(d).  As a result, a complaint that lacks specific averments regarding a quiet-title claim's basis fails to establish that the United States has waived its sovereign immunity.

In Catron County v. United States, the Honorable Martha Vazquez, United States District Judge for the District of New Mexico, held that "Catron County falls short of satisfying the pleading requirements of the QTA" in an action to quiet title to an alleged R.S. 2477 right-of-way against the United States, because "Catron County's allegations as to the nature of its claimed right-of-way are undisputedly imprecise."  934 F. Supp. 2d at 1308.  Judge Vazquez based her holding on the complaint's lack of "any allegations identifying which entity held title to the alleged right-of-way pursuant to R.S. 2477 prior to 1899, when the land was transferred to the federal government, or how title was subsequently transferred from that entity to Catron County."  934 F. Supp. 2d at 1308.  Moreover, Judge Vazquez rejected Catron County's argument that it should be excused from the Quiet Title Act's pleading requirements, because the United States purportedly knew what right-of-way was at issue.  See 934 F. Supp. 2d at 1308.

She stated: "A plaintiff is not relieved of its obligation to plead its interests in property with precision, simply because the other parties may know the details of the property at issue." 934 F. Supp. 2d at 1308. Accordingly, she dismissed the plaintiff's quiet-title claim for lack of jurisdiction. See 934 F. Supp. 2d at 1308.

Similarly, in Washington County v. United States, the Honorable David Sam, United States District Judge for the District of Utah, dismissed several claims related to R.S. 2477 rights-of-way partly on the ground that the complaint did not allege with particularity the interests asserted or the circumstances under which the plaintiff allegedly acquired those interests. See 903 F. Supp. at 42. The plaintiff county alleged that it owned the highway rights-of-way "shown on the map attached to its complaint and that it acquired its rights-of-way through public use, by County construction and maintenance of the rights-of-way or both." 903 F. Supp. at 42 (internal quotation marks omitted). Judge Sam concluded that the county's conclusory allegations did not identify "with particularity" any real property interest, and failed to describe "the circumstances under which" it acquired such property interest. 903 F. Supp. at 42. Accordingly, Judge Sam held that the county's failure to comply with § 2409a(d)'s pleading requirements served as an alternative basis to dismiss the county's quiet title claim. See 903 F. Supp. at 42. See also Hazel Green Ranch, LLC v. U.S. Dep't of Interior, 2010 WL 1342914, at *6 (E.D. Cal. April 5, 2010)(Wanger, J.)(dismissing quiet title claims "on the ground that the County has not provided a clear and consistent description of the claimed property interest(s)," thereby failing to plead with particularity).

Northern New Mexicans' Complaint suffers from the same deficiencies that contributed to the quiet-title claims' dismissal in the above cases. The Complaint identifies its alleged rights-of-way as roads "commonly known as County Roads 84, 84A, 84B, 84C, 84D, and Sandy Way

road."  Complaint ¶ 40, at 7.  It fails to allege with particularity the rights-of-ways' actual location, their length, their course, or their widths.  It alleges that the rights-of-way provide "direct access to the fee simple property of Plaintiff from State Highway 502, formerly State Route 4," but does not describe the location of its alleged "fee simple property" that these rights-of-way purportedly serve.  Complaint ¶ 20, at 5.

Northern New Mexicans' Complaint lacks basic information about how it acquired a cognizable interest in the rights-of-way.  It offers allegations that "[t]he rights-of-way easements were created and exist per [R.S. 2477,]" and that "[t]he public County Roads in question were established prior to 1900 across lands that, at the time, were within the territory of the United States and otherwise unreserved."  Complaint ¶ 14, at 4.  Vaguely alleging that the roads were established sometime before 1900 falls short of § 2409a(d)'s pleading requirements.  See Washington County v. United States, 903 F. Supp. at 42; Hazel Green Ranch, LLC v. U.S. Dep't of Interior, 2010 WL 1342914, at *6-8; Catron County v. United States, 934 F. Supp. 2d at 1308. Moreover, Northern New Mexicans' Complaint contradicts itself in alleging that different parties hold title to the rights-of-way.  At one point, it states that the "same roads have since been regarded as public rights-of-way owned by the State of Mexico."  Complaint ¶ 17, at 4.  At another point, it states that the rights-of-way are "already possessed by the County."  Complaint ¶ 23, at 5.  Then, it asserts that the rights-of-way are "Plaintiff's vested easement."  Complaint ¶ 32, at 6.  Finally, it argues that its "members have a vested right of ingress and egress to their private property over the rights-of-way for which the County of Santa Fe holds title."  Complaint ¶ 39, at 7.  Accordingly, Northern New Mexicans does not allege who holds the rights-of-way with any particularity and provides no description how each of those parties acquired their interests, as § 2409a(d) requires.  See 28 U.S.C. § 2409a(d).  The Court also notes that Northern

New Mexicans does not identify "the right, title, or interest claimed by the United States."  28 U.S.C. § 2409a(d).

Northern New Mexicans makes one brief argument in response.  See Response at 13. The Court notes that Northern New Mexicans does not attempt to argue that its Complaint meets the Quiet Title Act's pleading requirements.  Instead, it argues that it should be excused from meeting those requirements.  See Response at 13.  It contends that it need not plead with such particularity because it identified the roads in the same manner as the United States.  See Response at 13 ("Plaintiff has described the rights-of-way to which BIA alleges Plaintiff's members use in trespass, in the exact same manner and description used by BIA.").  First, the December 6 Letter is not a lawsuit under the Quiet Title Act and does not need to comply with § 2409a(d)'s requirements.  Second, Northern New Mexicans' argument is similar to the argument that Judge Vazquez summarily dismissed in Catron County v. United States.  See 934 F. Supp. 2d at 1308.  There, Catron County contended that it should be excused from the Quiet Title Act's pleading requirements, because the United States purportedly knew what right-of-way was at issue.  See 934 F. Supp. 2d at 1308.  Judge Vazquez rejected that argument for the same reason the Court rejects Northern New Mexicans' argument here.  "A plaintiff is not relieved of its obligation to plead its interests in property with precision, simply because the other parties may know the details of the property at issue."  Catron Cty. v. United States, 934 F. Supp. 2d at 1308. The Court is not free to ignore Congress' statutory requests just because everyone knew about the land to which Northern New Mexicans was referring.  If Congress wants something in a complaint, it must be there, not somewhere else or not provided at all.

In conclusion, Northern New Mexicans fails to plead its quiet-title claim with the particularity required to invoke the Quiet Title Act's sovereign immunity waiver, with respect to

the nature of its claims in the alleged rights-of-way, the circumstances under which it acquired those rights of way, and the United States' interests.  Northern New Mexicans' vague allegations deprive the United States, the Court, and the public of their right to know the precise contours of Northern New Mexicans' quiet-title claim.  The Court therefore lacks jurisdiction and dismisses this claim.

III.    **NORTHERN NEW MEXICANS CANNOT PURSUE ITS REMAINING CLAIMS, BECAUSE THE QUIET TITLE ACT IS THE EXCLUSIVE MEANS FOR LITIGATING TITLE DISPUTES AGAINST THE UNITED STATES.**

The Quiet Title Act provides the exclusive means for litigating title disputes against the United States.  See Block v. North Dakota, 461 U.S. 273, 277-78 (1983).  In Block v. North Dakota, North Dakota sued several federal officials to resolve a "dispute as to ownership of [a] riverbed." 461 U.S. at 277-78.  It invoked several jurisdictional bases for its suit: (i) 28 U.S.C. § 1331 (federal question); (ii) 28 U.S.C. § 1361 (mandamus); (iii) 28 U.S.C. §§ 2201-2202 (declaratory judgment and further relief); and (iv) 5 U.S.C. §§ 701-706 (the APA's judicial review provisions).[11]  North Dakota later amended its complaint to allege a quiet-title claim.  See 461 U.S. at 278.

The Supreme Court held that the Quiet Title Act "provide[s] the exclusive means by which adverse claimants could challenge the United States' title to real property." 461 U.S. at 286.  It determined that, even though North Dakota invoked the Court's jurisdiction under various other statutes, the claims still sounded in quiet title and had to satisfy the Quiet Title Act's requirements.  See 461 U.S. at 286; id. at 286 n.22 (stating that the Quiet Title Act "expressly 'forbids the relief'" the plaintiffs sought under the APA).  The Supreme Court noted

---

[11]Northern New Mexico invokes many of these same provisions in an attempt to establish the Court's jurisdiction.  See Complaint ¶ 6, at 3 (arguing that the Court has jurisdiction pursuant to the Federal Question statute and the Declaratory Judgment Act); id. ¶ 8, at 3 (alleging that the Court has jurisdiction pursuant to the APA's judicial review provisions).

that, if North Dakota could use other statutes to determine ownership of Indian lands, "all of the carefully-crafted provisions of the QTA deemed necessary for the protection of the national public interest could be averted."  461 U.S. at 284-85.  Thus, the Supreme Court concluded that "North Dakota's action may proceed, if at all, only under the QTA."  461 U.S. at 292-93.

Likewise, in United States v. Mottaz, 476 U.S. 834 (1986), the Supreme Court reiterated that the Quiet Title Act provides the exclusive means for bringing cases that depend on the resolution of a dispute with the United States over a property interest.  See 476 U.S. at 847.  Like in Block v. North Dakota, the plaintiff sought to avoid the Quiet Title Act's requirements and limitations by pleading her interests in Indian allotments under various federal statutes, and under the Fifth Amendment Due Process and Takings Clauses.  See United States v. Mottaz, 476 U.S. at 838.  The Supreme Court stressed that allowing such claims to proceed without strictly adhering to the Quiet Title Act's requirements "could also seriously disrupt ongoing federal programs," posing "precisely the threat to ongoing federal activities on the property that the Quiet Title Act was intended to avoid."  476 U.S. at 847.  Consequently, the Supreme Court held that the plaintiff's claim was barred.  See 476 U.S. at 836.

The Tenth Circuit has similarly determined that an APA suit alleging that a governmental decision is arbitrary and capricious can be "a 'quiet title' action sufficient to invoke the Quiet Title Act."  Governor of Kan. v. Kempthorne, 516 F.3d at 842.  Like Northern New Mexico does here, the plaintiffs in Neighbors for Rational Development, Inc. v. Norton argued that the Quiet Title Act did not apply because "its suit was not a quiet title action but an APA challenge to the Secretary's decision to place the land in trust."  Governor of Kan. v. Kempthorne, 516 F.3d at 842 (describing Neighbors for Rational Dev., Inc. v. Norton, 379 F.3d at 960).  Nonetheless, the Tenth Circuit "held that a court faced with a suit challenging the United States' title to land held

in trust for an Indian tribe must focus on the *relief* sought by the plaintiffs." Governor of Kan. v. Kempthorne, 516 F.3d at 842 (describing Neighbors for Rational Dev., Inc. v. Norton, 379 F.3d at 962). The plaintiffs sought a permanent injunction regarding the land and asked the court to "enter a declaratory judgment that the trust acquisition is null and void." Neighbors for Rational Dev., Inc. v. Norton, 379 F.3d at 961-62. The Tenth Circuit held that "these requests fall within the scope of suits the Indian trust land exemption in the Quiet Title Act sought to prevent." Neighbors for Rational Dev., Inc. v. Norton, 379 F.3d at 961-62. In short, it concluded that "the Quiet Title Act precludes Neighbors' suit to the extent it seek[s] to nullify the trust acquisition." Neighbors for Rational Dev., Inc. v. Norton, 379 F.3d at 965.

The Tenth Circuit arrived at the same conclusion in other cases. For example, in Shivwits Band of Paiute Indians v. Utah, 428 F.3d 966 (10th Cir. 2005), it held that the Quiet Title Act barred jurisdiction to hear the plaintiffs' arguments "to the extent [they] sought to challenge the BIA's decision to take the property at issue into trust." 428 F.3d at 976. Similarly, in Governor of Kansas v. Kempthorne, it held that the plaintiffs' APA claims "plainly presents a direct challenge to the United States' title for the Shriner Tract held in trust for the Wyandotte and therefore 'fall[s] within the scope of suits the Indian trust land exemption in the Quiet Title Act sought to prevent.'" Governor of Kan. v. Kempthorne, 516 F.3d at 843 (quoting Neighbors for Rational Dev., Inc. v. Norton, 379 F.3d at 962). Finally, in Rosette v. United States, 141 F.3d 1394 (10th Cir. 1998), it held: "Insofar as [the plaintiff's] current claims are all linked to the question of title, the Quiet Title Act provides the exclusive remedy." 141 F.3d at 1397. "Allowing [the plaintiff] to maintain a declaratory judgment action under these circumstances would undermine the policies set forth in *Block*." Rosette v. United States, 141 F.3d at 1397.

The relief that Northern New Mexicans seeks in its remaining claims is functionally identical to the relief the plaintiffs sought in the Tenth Circuit cases described.  Specifically, it seeks: (i) a declaratory judgment that the "Defendants' interference with Plaintiff's vested access rights" under the Treaty of Guadalupe Hidalgo "is arbitrary, capricious, an abuse of discretion and/or otherwise unlawful"; (ii) an injunction prohibiting the Defendants from "interfering with public's vested rights identified in this Complaint"; (iii) a declaratory judgment that the Defendants' December 6 Letter "deprive[s] Plaintiff's members of the ability to access their private property and utilize their vested public easement is a taking of Plaintiff's members private property in violation of the 5th Amendment and Due Process Clause"; and (iv) a declaratory judgment that the Defendants' actions violate its members property rights granted in the Treaty of Guadalupe Hidalgo.  Complaint ¶¶ 1-5, at 10-11.  Like in the Tenth Circuit cases, each cause of action and every form of relief asks the Court to determine who owns the disputed roads on San Ildefonso Pueblo lands.  Accordingly, the claims fall within the scope of suits that the Indian trust land exemption in the Quiet Title Act seeks to prevent.  "[T]he United States' sovereign immunity prevents the federal courts from exercising jurisdiction over this case." Governor of Kan. v. Kempthorne, 516 F.3d at 843.

To pursue its argument that its members have rights-of-way and easements across San Ildefonso Pueblo lands, Northern New Mexicans must proceed under the Quiet Title Act.  When plaintiffs cannot proceed via the Quiet Title Act, they do not have a freewheeling right to sue under a different statute.  See Sw. Four Wheel Drive Ass'n v. Bureau of Land Management, 363 F.3d at 1071.  The Tenth Circuit has held that, "if [an association] cannot state a claim under the Quiet Title Act, it has no other recourse against the United States" to obtain title.  Sw. Four Wheel Drive Ass'n v. Bureau of Land Management, 363 F.3d at 1071.  The Court therefore

dismisses its other claims and requests for relief.  See Catron Cty. v. United States, 934 F. Supp.

2d at 1308-09 (holding that Catron County's claims for a declaratory judgment and a writ of

mandamus were both linked to the question of title over an alleged right-of-way and were

therefore barred, because "the Quiet Title Act provides the exclusive remedy"); Friends of

Panamint Valley v. Kempthorne, 499 F. Supp. 2d 1165, 1177-78 (E.D. Cal. 2007)(dismissing for

lack of subject matter jurisdiction declaratory judgment and mandamus claims, because such

claims "can only be brought pursuant to the Quiet Title Act's narrow waiver of sovereign

immunity").

**IT IS ORDERED** that the Federal Defendants' Motion to Dismiss and/or For Judgment

on the Pleadings; Memorandum in Support, filed November 10, 2015 (Doc. 22), is granted.

Plaintiff Northern New Mexicans Protecting Land Water and Rights' Complaint for Judicial

Review Under the Administrative Procedures Act, 5 U.S.C. § 706; for Declaratory and

Injunctive Relief Pursuant to 28 U.S.C. § 2201; and for a Violation of Equal Protection Under

the Law, filed June 30, 2015 (Doc. 1), and the claims therein are dismissed without prejudice for

lack of jurisdiction.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

A. Blair Dunn
Dori E. Richards
Western Agriculture Resource and Business Advocates, LLP
Albuquerque, New Mexico

*Attorneys for the Plaintiff*

Damon P. Martinez
  United States Attorney
Ruth Fuess Keegan
Karen Grohman
  Assistant United States Attorneys
Albuquerque, New Mexico

-- and --

John C. Cruden
  Assistant Attorney General
Andrew A. Smith
United States Department of Justice
Environment and Natural Resources Division
Albuquerque, New Mexico

    *Attorneys for the Defendants*